UNITED STATES *v.* NICHOLSON.

*(District Court, D. Oregon. June 14, 1882.)*

SPACE APPROPRIATED TO PASSENGERS.

> A space upon a vessel bringing passengers into the United States, under the act of March 3, 1855, (10 St. 715; section 4252, Rev. St.,) is not "appropriated" to their use within the meaning of the term, or the object and policy of the statute, unless it is given up to their *exclusive* use; and therefore the dining saloon of a steamship carrying Chinese passengers from Hong Kong to Portland, Oregon, in which such passengers were allowed to go and come during the day, but to which no number of them were allotted or assigned, and in which they neither ate nor slept, was not a space appropriated to their use.

Information for Violation of Passenger Act.

*J. F. Watson*, for plaintiff.

*John W. Whalley*, for defendant.

DEADY, J. On March 29, 1882, the British steam-ship Glenelg sailed from the port of Hong Kong with Chinese passengers for this port, and arrived at Astoria with them on May 7th.

On May 20th the district attorney filed an information against the defendant, charging him, as master of said vessel, with a violation of

section 4252 of the Revised Statutes, by taking thereon and bringing to Oregon 105 more passengers than he was entitled to carry in the space appropriated to them.

The passenger list contains the names of 615 persons, 9 of whom are described as "boys," although ranging from 11 to 13 years of age. This list also contains the names of 23 Chinese, alleged to be, on the ship's "articles," to-wit: One interpreter, 3 stewards, 4 doctors, and 15 cooks. In the case of the master of the British steamship Anerly, lately tried in this court, it was claimed that a similar lot of persons were not to be reckoned as passengers, but as a part of the crew, because their names were put on the ship's articles. But the test is, not where were their names, but what space did their bodies occupy? If they occupied the space appropriated to passengers, they are either passengers, or diminish the space appropriated thereto in proportion to their number. The result is the same in either case.

Whether the putting of these cooks, doctors, etc., upon the articles is a mere device to evade the law, or a convenient contrivance to bring them under the discipline of the ship in the discharge of their duties towards their countrymen, is immaterial. As long as they occupy the space allotted to passengers, they are, nevertheless, to be counted as such. In the case of the Anerly they were held to be passengers, and the contrary is not claimed in this. Neither were there any "boys" on the list in the sense of the passenger act, which allows two "children," "over one and under eight years of age," to be counted as one passenger. Section 4252, Rev. St. Therefore it must be considered that the vessel carried 638 passengers.

By the Hong Kong emigration officer's certificate, the vessel was entitled to take on 638 adult passengers, and it appears from the same that she had on board when she sailed 628 adults and "10 male children" between the ages of 1 and 12. By the measurement of the surveyor of the port of Hong Kong, made under the American act, she was entitled to carry 635 passengers; and by the measurement of the inspector at Astoria she might have carried, in the spaces measured for passengers at Hong Kong, 645 persons. But said inspector also found, and it is now so admitted by the defendant, that the after space on the "'tween-decks," which was measured for 45 passengers, was filled with ship's stores; and also that the after saloon on the main deck, which was measured for 57 passengers, was not appropriated to their use; and this latter is the point in dispute.

The law provides, (section 4252, Rev. St.,) "the spaces appropriated" for the use of passengers shall not be otherwise occupied except with their "personal baggage," and on the main deck shall be in the proportion of "16 clear superficial feet of deck" for each passenger. The term "appropriate" is derived from the Latin, *ad* and *proprius*, and signifies "to take as one's own by exclusive right." Worcest. Dict. A space, therefore, is not "appropriated" to the use of passengers so long as any one else is allowed the use of it also. This is the literal meaning of the word, and the evident sense in which it is used in the statute.

Three measurements of the space in the saloon have been offered in evidence—the one made at Hong Kong, giving it a capacity for 57 passengers; the one made at Astoria, for 67 passengers; and one made here by a competent person, Mr. Henry L. Hoyt, for 72. None of these measurements are official. Congress has not provided that any particular person shall make the survey, except the one made by the inspector upon the arrival of the vessel in the United States, and then the report of such survey is only *prima facie* evidence of a *compliance* with the law when approved by the collector. Section 4264, Rev. St. The inspector did not find that the law had been complied with, and there is no such report in the case. It is the duty of the master to know how many passengers his vessel can carry, or how many can be carried in any particular space on it, and to see that the provisions of the statute are complied with. *The Anna*, Taney's Dec. 559; *U. S.* v. *Morton*, 1 Low. 179. And if there is a dispute as to the measurement the court must decide it upon the evidence. In the mean time the law casts the responsibility upon the master, and if he allows his owners or charterers to overload his vessel he must take the consequences. But it is not necessary to decide between these conflicting measurements, because upon the evidence it is clear that the space in this saloon was never "appropriated" to the use of any of the passengers upon this vessel.

The burden of the vessel is 394.74 tons, and she was built for carrying first-class passengers. This was the dining saloon, and elegantly furnished. It contained four dining tables, from 12 to 14 feet in length, when drawn out; a cushioned seat ran around the sides, from which the velvet cushions were removed during the voyage. The master and his officers took their meals there, and the master's cabin was an enclosure at one end of it and opened into it. After the first few days out from Hong Kong, and when the passengers began to recover from seasickness, they came on the main deck

for exercise, and some of them were in the habit of going into the cabin daily during the cold weather and warming themselves at the stove; and on some occasions some of them laid down on the floor near the same.

The defendant, who appears to have been very kind and considerate with the passengers, directed the steward to let them have the run of the ship, and he often sat in the saloon and talked with parties of them who could speak some English, particularly after the vessel broke her shaft, which she did about 100 miles from this shore; and sometimes entertained them by playing on the piano or harmonium. But no particular passengers were ever assigned to this space; nor did any passenger eat or sleep there during the voyage; and if any were present when the officers sat down to their meals they respectfully retired.

This is the case upon the testimony of the defendant; and it is evident that this space was not appropriated to any 57 or other number of these Chinese passengers. Probably not more than 10 of them were ever in there at once, and seldom so many. None of them were berthed or allotted there; and the fact seems to be that when taking exercise on the main deck, as they were entitled to, they simply had the privilege of lounging in the saloon more or less during the day. But the inspector who surveyed the vessel and counted the passengers testified that the chief officer, who showed him around the vessel, told him that the saloon was not "used" by the passengers, and his two assistants testify that they were present and heard the conversation. At this time the master was on shore, and objection was made to the admission of the mate's declarations in his absence. But the mate was in the master's place for the time being, and his declarations while pointing out the spaces occupied by the passengers, concerning that matter, I think are a part of the *res gestæ*, and therefore competent. But, be this as it may, the case is clear against the defendant upon the evidence introduced by him.

As was said by Mr. Chief Justice Taney in *The Anna, supra:*

"There is certainly nothing in the object and policy of the law to induce the court to restrain the operation of this clause of the statute within narrower limits than its language naturally and justly imports. Before congress legislated upon the subject, the transportation of passengers to this country was, in many instances, conducted in a manner that shocked the moral sense of the community. The ships were crowded to excess; the places allotted the passengers not ventilated; and they were often, during the voyage, fed upon unwholesome food, or restricted to a very scanty allowance. The natural result was that ships were constantly arriving with contagious and infectious

diseases on board; and, after having lost on the voyage a great portion of the passengers, brought the survivors into the country so emaciated with disease as to become a public burden, and often introducing contagious and infectious maladies contracted on shipboard, endangering thereby the health and lives of our own citizens."

And although none of these evil consequences appear to have followed the violation of the law in this case, the construction and application of it as a preventive thereof cannot be varied or modified on that account.

My conclusion then is that the defendant is guilty of a violation of the law in bringing into this district 105 passengers in excess of what he was allowed to carry in the spaces appropriated to them, for which the law will impose upon him a fine of $50 apiece, or $5,250 in the aggregate.

NOTE. A mate acting as master is liable to the fine imposed on the master, although the agreement with the passengers was made with the former master, if he had knowledge of the facts, and had an opportunity to annul the contract before leaving the foreign port. *U. S.* v. *Morton,* 1 Low. 179. Where the passengers go on board openly, they are presumed to have been taken on board by the master within the purview of this section, (*U. S.* v. *Thomson,* 12 FED. REP. 265;) and where the libel states the offence in the words of the statute, it is sufficient. *U. S.* v. *The Neurea,* 19 How. 94. —[ED.